**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**MARK D.,**

               **Plaintiff,**

     **v.**                           **Civil Action 3:22-cv-58
Judge Michael J. Newman
Magistrate Judge Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

               **Defendant.**

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff, Mark D., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.     BACKGROUND

Plaintiff previously filed applications for SSI on October 10, 2007, May 24, 2011, and February 10, 2014. (Tr. 70, 90, 113, 138). Each application proceeded to administrative hearings, and the Administrative Law Judges issued unfavorable decisions. (*See* Tr. 67–83, 87–105, 110–30).

Plaintiff protectively filed his current application for SSI on April 10, 2019, alleging that he was disabled beginning April 10, 2019, due to depression, anxiety, Bipolar Disorder, schizophrenia, high blood pressure, acid reflux and sleep apnea. (Tr. 250–71, 299). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on December 2, 2020. (Tr. 36–66). The ALJ denied benefits in a written decision on

February 17, 2021.  (Tr. 12–35).  That became the final decision of the Commissioner when the

Appeals Council denied review.  (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on February

28, 2022 (Doc. 1), and the Commissioner filed the administrative record on May 3, 2022 (Doc. 7).

The matter has been briefed and is ripe for consideration.  (Docs. 8, 10, 11).

### A.  Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as well as his statements to the agency:

In pre-hearing statements and in testimony at the hearing, [Plaintiff] alleged that he does not leave the house much, does not socialize often, sleeps often, has difficulty getting along with others, experiences fatigue, experiences swelling in his right ankle and left hand, has difficulty using his hands, has auditory and visual hallucinations and nightmares, and has difficulty managing his mood (D2E; D7F; Testimony).

(Tr. 21).

In pre-hearing statements and in testimony at the hearing, [Plaintiff] stated that he can live alone, watch TV, do chores, manage his own medications, man[a]ge his own personal care, prepare meals, shop in stores for groceries, and get along with family (D2E; D7F; Testimony).

(Tr. 25).

### B.  Relevant Medical Evidence

The ALJ discussed Plaintiff's physical impairments as follows:

Regarding [Plaintiff]'s status-post right ankle surgery and subsequent hardware removal, the claimant underwent right ankle surgery in November 2013, with a hardware removal (D5F/5-6; D15F/45; D17F/19). However, physical examinations in the record repeatedly show that the claimant has a normal gait, with no instability and normal strength and range of motion in the right lower extremity (D2F/8, 10, 13; D20F).

***
Regarding [Plaintiff]'s left hand flexor contracture, the record reflects that [Plaintiff] has a history of left-hand flexor contracture (D3A; D5A). However, the record does not reflect that [Plaintiff] has received ongoing treatment for this impairment during the relevant time period. Further, the record reflects that, since the alleged onset date, [Plaintiff] has regularly displayed normal findings in the left

2

upper extremity on examination, including normal strength, normal sensation, intact motor function, and full range of motion (D2F/8, 10, 13; D5F/10; D9F/7; D12F/3; D15F/79; D16F/51; D17F/37, 68).

***

Regarding [Plaintiff]'s RA, [Plaintiff] has a diagnosis of RA (D12F/2; D21F/7). [Plaintiff] experienced some rheumatoid symptoms in his left shoulder in January 2019, but refused to take prescribed medications, preferring to discuss a marijuana card (D2F; D12F/2-4). Further, it does not appear that [Plaintiff]'s left shoulder complaints were ongoing, and physical examinations in the record repeatedly show that [Plaintiff] has a normal gait, with no instability and normal strength and range of motion in the lower extremities, as well as normal strength, normal sensation, intact motor function, and full range of motion in the upper extremities (D2F/8, 10, 13; D5F/10; D9F/7; D12F/3; D15F/79; D16F/51; D17F/37, 68; D20F).

***

Regarding [Plaintiff]'s narcolepsy, while [Plaintiff] has a 2007 diagnosis of narcolepsy, this diagnosis has been categorized as "questionable," and the record does not reflect significant ongoing treatment for this condition (D5F/4; D6F/4; D13F/5; D16F/81; D17F/53).

***

Regarding [Plaintiff]'s hypertension, the record reflects a long history of hypertension (D17F/66). His hypertension has been categorized an "uncontrolled" when [Plaintiff] is not compliant with his recommended treatment, but has mostly been categorized as "benign" (D6F/4; D15F/11; D16F/2, 49, 60; D17F/18, 31, 38, 50). The record reflects that [Plaintiff] is not always consistent with taking his blood pressure medications because he "does not care about it" (D17F/34, 38).

***

Regarding [Plaintiff]'s GERD, [Plaintiff] has an ongoing diagnosis of GERD (D15F/1-2; D16F/76). However, exacerbations of [Plaintiff]'s GERD in the record have been associated with episodes of excessive alcohol use, and have been responsive to conservative treatment (D2F/9; D15F/1-2; D16F/80, 85; D17F/34, 37-39).

***

Regarding [Plaintiff]'s asthma and OSA, [Plaintiff]'s asthma has been assessed as mild, and [Plaintiff] does not use an inhaler (D16F/81; D17F/50, 53, 66). [Plaintiff] has been prescribed a CPAP for his OSA, though he is not compliant with this treatment recommendation (D15F/42; D16F/6, 11; D17F/53). On examination, [Plaintiff] has shown grossly normal respiratory findings, including normal

3

respiration rate, lungs clear to auscultation bilaterally, and no rales, rhonchi, or wheezes (D6F/6; D12F/3; D16F/51; D17F/6, 37, 56, 60; D20F/3). He has shown no evidenced of acute cardiopulmonary process on objective imaging (D6F/12; D15F/33, 48). [Plaintiff] also engages in ongoing cigarette use (D15F/22).

***

Regarding [Plaintiff]'s obesity, [Plaintiff] has shown obese BMIs and been evaluated as obese in the record, but [Plaintiff]'s weight has fluctuated, and his BMIs have typically been only mildly obese (D2F/10; D5F/10; D6F/6; D15F/1, 79; D16F/37; D17F/38; D20F/3).

(Tr. 22–24).

Germane to the discussion below, the ALJ discussed Plaintiff's mental impairments as follows:

Regarding [Plaintiff]'s anxiety, depression, bipolar disorder, schizophrenia, intermittent explosive disorder, and polysubstance abuse disorder, the record reflects [Plaintiff] experiencing ongoing mental health symptoms, with treatment dating back to November 2016 (D1F/5-8). At a July 2019 consultative psychological examination, [Plaintiff] reported a history of two psychiatric hospitalizations, most recently in 2018, a history of legal problems, a history of alcohol use, a history of suicidal ideation and physical altercations, and ongoing problems with depression, anxiety, frustration, and mood swings (D7F). On mental status examination, [Plaintiff] displayed a depressed mood and flat affect, a slight impairment in attention, and some difficulty with hypothetical problem solving and judgment, but also adequate hygiene and grooming, good eye contact, no psychomotor agitation, appropriate behavior, normal speech, coherent thought process, unremarkable thought content, full alertness and orientation, adequate memory, and low-average intelligence (D7F).

[Plaintiff]'s most significant psychological symptoms in the record appear to be in response to acute family stressors, and he has reported ongoing heavy alcohol use (D8F/8; D15F/19-22, 30, 41-42; D17F/21, 24). He has reported experiencing hallucinations and suicidal ideation at times (D14F/11; D15F/22). On mental status examinations in the record, [Plaintiff] has displayed some abnormal findings, such as constricted affect, but has generally shown unremarkable mental status findings including appropriate grooming, normal speech, goal-directed thought process, intact associations, intact judgment, full orientation, normal memory, adequate fund of knowledge, appropriate mood, adequate attention and concentration, unremarkable thought content (including no hallucinations nor suicidal ideation), appropriate eye contact, and intact judgment (D8F/8-9; D10F/8-20; D14F).

(Tr. 24).

4

## C.  The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since April 10, 2019, the application date.  (Tr. 18).  The ALJ determined that Plaintiff suffered from the following severe impairments: status-post right ankle surgery and subsequent hardware removal; left hand flexor contracture; rheumatoid arthritis (RA); narcolepsy; hypertension; gastroesophageal reflux disease (GERD); asthma; obstructive sleep apnea (OSA); obesity; anxiety; depression; bipolar disorder; schizophrenia; intermittent explosive disorder; and polysubstance abuse disorder.  (*Id.*).  The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment.  (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> After careful consideration of the entire record, the [ALJ] finds that [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except [Plaintiff] can only stand and/or walk for four hours; can frequently handle, finger, and feel bilaterally; can perform simple, routine tasks, but not at a production rate pace, and without strict performance quotas; can have occasional interaction with supervisors and co-workers, but no interaction with the general public; can perform no jobs requiring teamwork or tandem tasks; can perform no jobs involving "over-the-shoulder" supervision; and can tolerate occasional changes to a routine work setting, defined as one-to-two per week.

(Tr. 20).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 21).

The ALJ determined that Plaintiff has no past relevant work.  (Tr. 27–28).  Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform light exertional, unskilled jobs that exist in significant numbers in the national economy, such as a packager or machine tender.  (Tr. 28–29).  He therefore concluded that Plaintiff "has not been under a disability,

as defined in the Social Security Act, since April 10, 2019, the date the application was filed (20 CFR 416.920(g))." (Tr. 29).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.    DISCUSSION

In his Statement of Errors, Plaintiff contends that the ALJ erred by using the wrong legal standard and relying on flawed opinion evidence, thus creating an unwarranted additional procedural burden for Plaintiff to overcome. (Doc. 8 at 5–7). Specifically, he says that the ALJ applied *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 839 (6th Cir. 1997)—when he should have followed *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). In addition, Plaintiff argues that the ALJ erred in evaluating the opinions of treating psychiatrist, R.O. Hardy, M.D. (Doc. 8 at 8–9).

6

The Commissioner counters that the ALJ analyzed the relevant evidence and reasonably concluded that Plaintiff developed new impairments since the prior hearing decision was issued and concluded that a change in Plaintiff's RFC was warranted and assessed the appropriate limitations. (Doc. 10 at 7–17). And, says the Commissioner, the ALJ considered the opinion evidence and reasonably concluded that Dr. Hardy's opinions lacked supportability and consistency. (*Id.* at 18–20).

## A.    The ALJ's Compliance with *Drummond* and *Earley*

In his first assignment of errors, Plaintiff argues that the ALJ reversibly erred because he applied *Drummond* (and not *Earley*), thereby creating an unwarranted additional procedural burden for him to overcome. (Doc. 5). The Undersigned disagrees.

### 1.    Drummond*, *Earley*, and Fresh Review*

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d at 842. In that case, the claimant's initial claim for SSI was denied when an ALJ found that she was capable of sedentary work. *Id*. at 838. When the claimant later re-filed her disability claim, a second ALJ found that she was capable of medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id*. at 839. After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound by the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in the claimant's condition. *Id*. at 841–42. The Sixth Circuit reasoned that "[j]ust as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id*. The Social Security Administration subsequently issued an

Acquiescence Ruling explaining how the ruling in *Drummond* would be applied to claims in the Sixth Circuit:

> When adjudicating a subsequent disability claim with an adjudicated period under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

AR 98-4(6), *Effect of Prior Findings on Adjudication of a Subsequent Disability Claim Arising Under the Same Title of the Social Security Act -- Titles II and XVI of the Social Security Act*, 1998 WL 283902, at *3 (June 1, 1998).

Then, in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit further clarified how *res judicata* applies to administrative proceedings.  When a claimant files a later application covering the same period as an earlier application, explained the Court, *res judicata* applies absent good cause to revisit the earlier determination.  *Id*. at 933.  But *res judicata* does not apply when a claimant files a subsequent application seeking benefits for a different period.  Instead, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review."  *Id*.  The Court cautioned that "fresh review is not blind review."  *Id*. at 934.  Although an ALJ evaluating a subsequent application is not bound to follow a previous determination, the ALJ may "nevertheless consider what an earlier judge did if for no other reason than to strive for consistent decision making."  *Id*.  Accordingly, "it is fair for an [ALJ] to take the view that, absent new and additional evidence, the first [ALJ's] findings are a legitimate, albeit not binding, consideration in reviewing a second application."  *Id*. at 933.

Since then, this Court has said that *Earley* "clarified" the Court's decision.  *Teasley v. Comm'r of Soc. Sec.*, No. 2:18-cv-1079, 2019 WL 2559514 at *5 (S.D. Ohio June 21, 2019).  "The Sixth Circuit explained that 'the key principles protected by *Drummond*—consistency between

proceedings and finality with respect to resolved applications'—do not prohibit the Social Security Administration 'from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in a prior proceeding.'" *Id.* (citing *Earley*, 893 F.3d at 933).

Therefore, as this Court has noted, "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application." *Id.* Thus, an ALJ's reference to *Drummond* does not automatically result in reversal. In fact, in *Dugan v. Commissioner of Social Security*, an early post-*Earley* decision, the Sixth Circuit cited to *Drummond* and noted that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 742 F. App'x 897, 901–02 (6th Cir. 2018). The Court explained that "[i]n such cases, '[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ.'" *Id.* Thus, the Court found that the ALJ's pre-*Earley* analysis satisfied the legal standard because she ultimately found new and material evidence of medical improvement which meant she was not bound by a prior ALJ's determination. *Id.* Said simply, citation to *Drummond* was not in and of itself enough to warrant remand. This Court, as well as other courts in the circuit, have come to the same conclusion.

In *Parsons v. Commissioner of Social Security*, for instance, the Court noted that "[the] ALJ [] failed to mention *Earley* even though it is applicable here. Nevertheless, [the ALJ] followed the precepts in *Early* by finding that new evidence undermined ALJ Bruce's RFC assessment." No. 2:20-cv-2594, 2021 WL 1015910, at *7 (S.D. Ohio Mar. 17, 2021). The same was true in *Mitchell v. Commissioner of Social Security*, where the United States District Court for the Eastern District

of Michigan explained that "the Court is less concerned as to whether the ALJ merely stated the wrong legal standard, and more concerned as to whether the ALJ applied the wrong legal standard. While a post-*Earley* ALJ's recitation of the pre-*Earley* standard raises a yellow flag, it is nevertheless possible that such a post-*Earley* ALJ decision could functionally comply with *Earley* if the ALJ gave the evidence a fresh look." No. CV 20-13414, 2022 WL 265869, at *2 n.3 (E.D. Mich. Jan. 28, 2022). *See also Civitarese v. Comm'r of Soc. Sec.*, No. 1:19-cv-2015, 2020 WL 4366077, at *14 (N.D. Ohio July 30, 2020).

So, while citation to *Drummond* without *Earley* raises a yellow flag, the ultimate question here is whether the ALJ gave a fresh review to the evidence.

### 2. *The ALJ's Fresh Review*

The previous decision denying Plaintiff's application for benefits was issued on November 8, 2016. (Tr. 113–25). This time around, Plaintiff applied for and alleged disability beginning on April 10, 2019.

A review of the ALJ's opinion shows that he reviewed the evidence during the applicable period—and also reviewed prior history and evidence. Turning to Plaintiff's mental abilities first, the ALJ noted that the record shows that Plaintiff had been experiencing ongoing mental health symptoms. (Tr. 24, citing Tr. 354–57). The ALJ provided historical context for Plaintiff's mental conditions and carefully discussed evidence from the relevant period noting that at a July 2019 consultative psychological examination—roughly three years after the prior decision—Plaintiff reported a history of two psychiatric hospitalizations, most recently in 2018. (Tr. 24, citing Tr. 476–77). The ALJ noted that Plaintiff reported a history of legal problems at the examination, as well as a history of alcohol abuse; a history of suicidal ideation and physical altercations; and ongoing problems with depression, anxiety, frustration, and mood swings. (Tr. 24, citing Tr. 476–

10

77).  The ALJ  analyzed clinical findings from the examination that showed Plaintiff's depressed mood and flat affect, slight impairment in attention, and some difficulty with hypothetical problem solving and judgment.  (Tr. 24, citing Tr. 478–79).  The ALJ also noted that Plaintiff's hygiene and grooming were adequate, he had good eye contact, no psychomotor agitation, appropriate behavior, normal speech, coherent thought process, unremarkable thought content, full alertness and orientation, adequate memory, and low-average intelligence.  (Tr. 24, citing Tr. 477–78).

And the ALJ did more.  The ALJ looked closely at the evidence noting that Plaintiff's most significant psychological symptoms in the record appeared to be in response to acute family stressors, and, the ALJ noted, Plaintiff reported ongoing heavy alcohol use.  (Tr. 24, citing Tr. 490, 607–10, 618, 570, 780, 783).  The ALJ also relied upon evidence from September 2018 and July 2020, wherein Plaintiff reported experiencing hallucinations and suicidal ideation at times.  (Tr. 24, citing Tr. 575, 610).  The ALJ went on to discuss Plaintiff's mental status examinations from March 2020 through October 2020.   (Tr. 24, citing Tr. 490–91, 527–39, 565–88).   During those examinations, Plaintiff displayed some abnormal findings (such as constricted affect) but generally had unremarkable mental status findings, including: appropriate grooming, normal speech, goal-directed thought process, intact associations, intact judgment, full orientation, normal memory, adequate fund of knowledge, appropriate mood, adequate attention and concentration, unremarkable thought content (including no hallucinations nor suicidal ideation), appropriate eye contact, and intact judgment (Tr. 24, citing Tr. 490–91, 527–39, 565–88).

The ALJ also considered Plaintiff's statements about his daily activities during the relevant time period.  The ALJ noted that in pre-hearing statements and testimony at the administrative hearing, Plaintiff stated that he could live on his own, watch television, perform household chores, manage his own medications, manage his own personal care, prepare meals, and shop in stores for

11

groceries.  (Tr. 25, citing Tr. 40, 51–52, 477).  The ALJ acknowledged that Plaintiff had some limitations performing the activities and stated that none of them were dispositive.  (Tr. 25).  Yet, taken together and considered in conjunction with the record evidence, the activities suggested to the ALJ that Plaintiff's impairments were less limiting than alleged.  (*Id.*).

The ALJ also considered evidence pertaining to Plaintiff's physical impairments—from both the current period as well as historic evidence.  The ALJ noted that Plaintiff underwent surgery on his right ankle in November 2013, but treatment records from June 2018 through November 2020 repeatedly show that Plaintiff had a normal gait with no instability, normal strength and normal range of motion in the right lower extremity.  (Tr. 22, citing Tr. 401, 403, 406, 847).  The ALJ considered Plaintiff's impairments of the left hand noting that he had a history of flexor contracture but had not received ongoing treatment during the relevant time period.  (Tr. 22, referring to Tr. 92, 115).  He discussed treatment records from April 2018 through October 2020, showing that Plaintiff regularly displayed normal findings in the left upper extremity on examination, including normal strength, normal sensation, intact motor function, and full range of motion.  (Tr. 22, citing Tr. 401, 403, 406, 433, 500, 547, 667, 725, 796, 827).  The ALJ addressed Plaintiff's rheumatoid arthritis (RA) (Tr. 22), noting that Plaintiff experienced symptoms in January 2019, but refused to take prescribed medications because he wanted a marijuana card.  (Tr. 22, referring to Tr. 408, 546–48).  Again, the ALJ discussed physical examinations from April 2018 through October 2020, and noted that they repeatedly showed normal findings.  (Tr. 22, citing Tr. 401, 403, 406, 433, 500, 547, 667, 725, 796, 827).

The ALJ also considered Plaintiff's other impairments and noted that they were either "questionable" (i.e., narcolepsy), uncontrolled when Plaintiff was not compliant with medication

12

(i.e., hypertension), or responsive to conservative treatment (i.e., GERD) (Tr. 23–24, citing Tr. 402, 427, 455, 556, 589–90, 599, 676, 723, 734, 754–55, 759, 777, 790, 793, 796–98, 809, 812).

The ALJ also addressed Plaintiff's respiratory impairments. (Tr. 20). The ALJ explained that Plaintiff's asthma and obstructive sleep apnea were mild and that he was not compliant with treatment. (Tr. 23). For instance, Plaintiff was prescribed a CPAP machine, but did not use the machine. (Tr. 23, citing Tr. 630, 680, 685, 812). The ALJ discussed evidence from the relevant period noting that Plaintiff's respiratory findings were grossly normal including a normal respiration rate, lungs clear to auscultation bilaterally, and no rales, rhonchi, or wheezing. (Tr. 23, citing Tr. 457, 547, 725, 765, 796, 815, 819, 798). The ALJ also noted that Plaintiff had shown no evidence of acute cardiopulmonary process on objective imaging. (Tr. 23, citing Tr. 463, 621, 636). Additionally, the ALJ discussed Plaintiff's obesity noting that his weight fluctuated throughout the relevant period. (Tr. 24, citing Tr. 403, 433, 457, 490, 667, 711, 797, 798).

The ALJ also considered the opinion evidence and prior administrative medical findings from the relevant period. The ALJ noted that in November 2020, Marquetta Colbert, APRN, one of Plaintiff's medical treatment providers opined that he could perform the lifting and carrying requirements of light work, but could stand and walk for only one hour per day, could never perform postural activities, and would be absent from work three times per month. (Tr. 25, citing Tr. 853–58). Ms. Colbert also opined that Plaintiff would be off-task half of the workday. (Tr. 25, Tr. citing 857). The ALJ concluded that Ms. Colbert's opinion was somewhat supportable and consistent with the record but that her own treatment records reflect mild findings, which were not consistent with the severe limitations she offered. (Tr. 25–26). The ALJ concluded that the record was most consistent with a light exertional capacity, as evidenced by Plaintiff's history of RA and impairments of the right ankle and left hand, but generally normal findings in the upper and lower

extremities on physical examinations, as well as Plaintiff's questionable narcolepsy diagnosis, benign hypertension, generally well-controlled GERD when not consuming alcohol, and unremarkable respiratory findings.  (Tr. 26, citing Tr. 401, 403, 406, 433, 500, 547, 667, 725, 765, 777, 790, 793, 796–98, 809, 845–52).

The ALJ also considered the prior administrative findings and expressly addressed the inconsistency in the assessments of the state agency doctors.  (Tr. 25).  The ALJ noted that in June 2019 and May 2020, state agency physicians Sreenivas Venkatachala M.D., and Gary Hinzman, M.D., opined that Plaintiff had nonsevere physical impairments.  (Tr. 25, citing Tr. 144–47, 154).  But, as the ALJ noted, despite finding no severe impairment, the doctors adopted the reasoning in the prior decision and limited Plaintiff to a range of light work.  (Tr. 25, citing Tr. 144–47, 154).  Significantly, the ALJ concluded that Drs. Venkatachala and Hinzman's findings were somewhat misplaced given the changes in Plaintiff's condition since the date of the prior decision.  (Tr. 25).  The ALJ concluded that the record was most consistent with a light exertional capacity, the ability to stand and walk only four hours, and the ability to frequently handle, finger, and feel bilaterally, as evidenced by Plaintiff's history of RA and impairments of the right ankle and left hand (all of which the ALJ found severe), but generally normal findings in the upper and lower extremities on physical examinations, as well as Plaintiff's questionable narcolepsy diagnosis, benign hypertension, generally well-controlled GERD when not consuming alcohol, and unremarkable respiratory findings.  (Tr. 18 (severe impairments), 25, citing Tr. 401, 403, 406, 433, 500, 547, 667, 725, 765, 777, 790, 793, 796–98, 809, 812, 827, 845–52).  Thus, the ALJ concluded that the prior administrative medical findings were unpersuasive.  (Tr. 25).

All told, the ALJ carefully considered the new evidence that was submitted in connection with the current application.  He satisfied the "fresh review" that *Earley* requires.  *See Parsons*,

14

2021 WL 1015910 at *7 (explaining that "ALJ Hostovich failed to mention *Earley* even though it is applicable here.  Nevertheless, ALJ Hostovich followed the precepts in *Early* by finding that new evidence undermined ALJ Bruce's RFC assessment.").  Significantly, Plaintiff has not explained what evidence the ALJ should have (but did not) consider.  And a review of the record and the ALJ's opinion shows that *Earley*'s precepts were satisfied.  There is no error.

### C.  The ALJ's Evaluation of Dr. Hardy's Opinion

Plaintiff also challenges how the ALJ evaluated the opinion of Dr. Hardy, Plaintiff's treating psychiatrist.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1) (2012).  A claimant's RFC assessment must be based on all the relevant evidence in his or her case file.  *Id*.  *See also* 20 C.F.R.  §§ 416.913(a), 416.920c (2017).  The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]  20 C.F.R. § 416.913(a)(1)–(5).  Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency";

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 416.913(a)(2), (5).

(3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 416.920c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 416.920c(b)(2).

Thus, the role of the ALJ is to articulate how he considered medical opinions and how persuasive he found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14.

When evaluating the opinion of Dr. Hardy, the ALJ determined:

R.O. Hardy, MD, one of [Plaintiff]'s mental health treatment providers, opined that [Plaintiff] had moderate-to-marked limitations in understanding, remembering, and applying information, in interacting with others, in concentrating, persisting, or maintain pace, and in adapting and managing oneself (D4F; D11F; D18F). These opinions lack supportability and consistency with the record. Dr. Hardy supports his opinion with an in-person treating relationship with [Plaintiff], but his own

treatment notes reflect mild findings not consistent with the severe limitations opined, and Dr. Hardy provides minimal explanation supporting the opined limitations or tying the limitations to specific medical findings. Additionally, the record is most consistent with moderate limitations in all four broad areas of mental functioning, and with limitations to simple, routine tasks, no production pace work, no strict production quotas, occasional interaction with supervisors and co-workers, no interaction with the general public, no jobs requiring teamwork or tandem tasks, no jobs involving "over-the-shoulder" supervision, and the ability to tolerate occasional changes in a routine work setting, as evidenced by [Plaintiff] showing some psychological distress in response to acute stressors, but generally showing mental status findings grossly within normal limits on mental status examinations (D8F/8-9; D10F/8-20; D14F). Accordingly, because these opinions lack supportability and consistency with the record, they are found unpersuasive.

(Tr. 27).

For context regarding the ALJ's conclusion about consistency, the ALJ discussed

the other opinions of record related to Plaintiff's mental health impairments as follows:

The State agency psychological consultants opined that [Plaintiff] had moderate limitations in all four broad areas of mental functioning (D7A; D9A). The consultants further opined that [Plaintiff] had specific limitations to simple, routine tasks, with no more than occasional contact with the public (D7A; D9A). These opinions are somewhat supportable and consistent with the record. The consultants support their opinions by relying on the reasoning of the November 8, 2016 Administrative Law Judge decision, which is somewhat misplaced given the changes in [Plaintiff]'s condition since the date of the prior decision. The record is consistent with moderate limitations in all four broad areas of mental functioning, and with limitations to simple, routine tasks, but is also consistent with limitations to no production pace work, no strict production quotas, occasional interaction with supervisors and co-workers, no interaction with the general public, no jobs requiring teamwork or tandem tasks, no jobs involving "over-the-shoulder" supervision, and the ability to tolerate occasional changes in a routine work setting, as evidenced by [Plaintiff] showing some psychological distress in response to acute stressors, but generally showing mental status findings grossly within normal limits on mental status examinations (D8F/8-9; D10F/8-20; D14F). Accordingly, because these opinions are supported by a misplaced reliance on a prior ALJ decision, and are not fully consistent with the record, they are found partially persuasive.

Richard Sexton, PhD, a consultative psychological examiner, opined that [Plaintiff] could "understand and apply instructions in a work setting consistent with low average intellectual functioning," that [Plaintiff] may experience subjective perceptions of reduced attention and concentration due to mood changes, but would not experience objective attention and concentration changes affecting his job

17

performance, had no limitations in his capacity to conform to social expectations in a work setting, and "is expected to have some difficulty responding appropriately to workplace pressures" (D7F/5-7). This opinion lacks supportability and consistency with the record. Dr. Sexton supports his opinion with an in-person examination, but provides vaguely-worded limitations in his opinion which are difficult to assess for supportability. Additionally, the record is most consistent with moderate limitations in all four broad areas of mental functioning, and with limitations to simple, routine tasks, no production pace work, no strict production quotas, occasional interaction with supervisors and co-workers, no interaction with the general public, no jobs requiring teamwork or tandem tasks, no jobs involving "over-the-shoulder" supervision, and the ability to tolerate occasional changes in a routine work setting, as evidenced by [Plaintiff] showing some psychological distress in response to acute stressors, but generally showing mental status findings grossly within normal limits on mental status examinations (D8F/8-9; D10F/8-20; D14F). Accordingly, because the opined limitations are vaguely-worded, and are not fully consistent with the record, this opinion is found unpersuasive.

(Tr. 26–27).

Plaintiff's complaint about this analysis appears to be two-fold.  He says that the state agency reviewers' opinions should not be trusted because they "merely adopted the mental RFC of the prior ALJ decision[.]"  (Doc. 8 at 9).  But the ALJ understood that defect and added restrictions to the RFC because of the state agency reviewers' "misplaced reliance" on the former ALJ's decision.  (Tr. 26 (adding the following limitations:  "[N]o production pace work, no strict production quotas, occasional interaction with supervisors and co-workers, no interaction with the general public, no jobs requiring teamwork or tandem tasks, no jobs involving 'over-the-shoulder' supervision, and the ability to tolerate occasional changes in a routine work setting").  So this argument has no merit.

Plaintiff also argues that the ALJ improperly discounted Dr. Hardy's opinions or selectively read the record.  The Undersigned disagrees.  The ALJ acknowledged the opinions upon which Plaintiff now relies, but, ultimately, found Dr. Hardy's conclusions to be unsupported by his own treatment records and inconsistent with other parts of the record.

In his analysis, the ALJ acknowledged that "the claimant show[ed] some psychological distress in response to acute stressors," but concluded that the examinations during the relevant time generally showed mental status findings grossly within normal limits.  (Tr. 22).  The ALJ's conclusion has support.  In August 2019, for instance, Plaintiff went to the doctor and said he was "in a mess" because he had recently lost his housing.  (*Id.*).  Despite Plaintiff's complaints, his mood was appropriate—though his affect was constricted—his attention span and concentration were average, and he reported no abnormal or psychotic thoughts.  (Tr. 491).  In March 2020, Plaintiff said he was "OK," but reported that he often felt lonely and lamented that he didn't have a romantic partner.  (Tr. 527).  Despite these complaints, his mood was appropriate, and he reported no abnormal or psychotic thoughts, and his mood disorder was stable.  (Tr. 530–31).  His affect, however, was constricted. (Tr. 530).

Plaintiff continued receiving treatment in 2020, and in June, he again reported "doing OK," but his anxiety was heightened due to the pandemic.  (Tr. 579).  Plaintiff's mood was appropriate, his affect was constricted, he reported no abnormal or psychotic thoughts and his mood disorder was stable.  (Tr. 582–83).  The following month, Plaintiff reported that treatment was going well and that he was happy with the services he had been receiving.  (Tr. 574).  But Plaintiff again reported increased anxiety and stress as a result of the COVID pandemic.  He also reported that his alcohol and marijuana abuse continued.  (*Id.*).

The ALJ considered the aforementioned records when evaluating Dr. Hardy's opinion.  (Tr. 22).  Though Plaintiff identifies other earlier records reflecting occasions when Plaintiff presented with "depressed mood, flat affect, impaired insight and concentration, unkempt, poor hygiene, withdrawn demeanor, avoidant eye contact, irritable mood, constricted affect, 'low mood,' visual hallucinations," (Doc. 8 at 8) (citing Tr. 361, 376, 379, 383), they do not exist in such volume as to

make the countervailing records cited the ALJ selective. Still more, the ALJ discussed those same records, from Eastway Corp., when he noted that "the record reflects [Plaintiff] experiencing ongoing mental health symptoms, with treatment dating back to November 2016" (Tr. 24, citing Tr. 354–57) before he distinguished those "abnormal findings" from Plaintiff's "generally . . . unremarkable mental status findings" (Tr. 24). So he did not ignore the materials Plaintiff now uses. *See Durio v. Comm'r of Soc. Sec.*, 1996 WL 169362 at *2 (6th Cir. Apr. 10, 1996) (explaining that the ALJ did not ignore evidence where he discussed it in the decision). Instead, the ALJ adequately explained why they were not compelling as required by the regulations. Particularly, he evaluated supportability and consistency as required, and the ALJ did not err.

**IV.     CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

**V.     PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation

*de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

      IT IS SO ORDERED.


Date:   January 19, 2023                /s/ Kimberly A. Jolson
                                                KIMBERLY A. JOLSON
                                                UNITED STATES MAGISTRATE JUDGE